Matthew T. Christensen
ANGSTMAN JOHNSON
3649 Lakeharbor Lane
Boise, Idaho 83703
Telephone: (208) 384-8588
Facsimile:  (208) 853-0117
Christensen ISB: 7213

Special Counsel for the Trustees

UNITED STATES BANKRUPTCY COURT

DISTRICT OF IDAHO

| | |
|---|---|
| In re:  DEAN MARVIN BORUP & GAIL SPJUTE BORUP,<br><br>Debtors. | Case No.: 10-02943-JDP |
| In re:  KEITH STEWART BORUP & JUDITH ANN BORUP,<br><br>Debtors. | Case No.: 10-02944-TLM |

## MOTION FOR APPROVAL OF COMPROMISE

COME NOW the Trustees, Jeremy J. Gugino (Trustee in Case No. 10-02943-JDP) and Richard E. Crawforth (Trustee in Case No. 10-02944-TLM) (collectively referred to herein as the "Trustees"), by and through their special counsel, ANGSTMAN JOHNSON, and move the court, pursuant to Fed. R. Bankr. Proc. 9019, for an order

MOTION FOR APPROVAL OF COMPROMISE - PAGE 1
Matter: 6396-024

approving a compromise with certain Defendants in two separate adversary proceedings (Adv. Case Nos. 11-06031-JDP and 12-06018-TLM, which were previously consolidated) and the two bankruptcy estates. The specific terms of the compromise are outlined below. In general terms, however, the bankruptcy estates are recovering the property transferred by the Debtors prior to the filing of their bankruptcy petitions (as well as certain proceeds from the sale or use of that property), and will retain 85% of the net proceeds from the sale of that property. In support of this Motion, the parties assert the following:

## **BACKGROUND FACTS**

Keith and Dean Borup (the "Borups") are brothers who have been investing in commercial and residential real property since the 1970's. Over the years, they purchased, both individually and in partnership with each other, approximately two dozen properties throughout the Treasure Valley. In addition, the Borups have been the majority shareholders of Borup Construction, Inc., which has been engaged in real property development and construction projects in the area for more than 20 years. In late 2006 and early 2007, the Borups met with an asset protection advisor ("Frontline") to discuss the assets they held and a strategy to protect those assets. The Borups' primary goals, as expressed to Frontline, were to achieve privacy regarding ownership of their assets and to protect those assets from possible claims of creditors. Frontline recommended a strategy by which the Borups would "own nothing but control everything", and which included setting up a labyrinth of entities through a layering approach. Frontline compared the layering approach to an onion, with its purpose being

MOTION FOR APPROVAL OF COMPROMISE - PAGE 2
Matter: 6396-024

that "when an adversary peels back one layer, he or she is faced by another layer – all the while shedding tears of frustration that [the Borups'] assets are so well protected from their grasp. The more frustrating and difficult to locate and seize assets, the more likely an adversary will want to settle out of court."

Based on Frontline's recommendation, and in accordance with their express goals to hide and protect their assets, the Borups (together with their wives, Gail and Judy) created two separate entity structures. The entity structure for Keith and Judy Borup is depicted on **Exhibit A** attached hereto. The entity structure for Dean and Gail Borup is depicted on **Exhibit B** attached hereto. The entity structures largely consisted of two separate partnerships controlled by Keith and Dean (the 7 Dwarves Limited Partnership, and the KandJ Limited Partnership), which in turn were 50% members in a series of limited liability companies. (In addition, each partnership had its own 100%-owned limited liability company.) The LLCs, in turn, were each the beneficiaries of a series of land trusts, which held title to the real property previously owned by the Borups. The manager of the LLC's and trustee of the trusts was a separate entity (Neilson, Inc.) which was entirely owned and controlled by the Borups.

The Borups set up their asset protection schemes at the same time business for Borup Construction, Inc., was slowing. Borup Construction, Inc., built residential homes, and was hard hit after 2006. The Borups had personally guaranteed many of the loans made to Borup Construction, Inc. Additionally, the Borups had personally received loans (secured by some of the real properties that were later transferred to the land trusts) which remained unpaid.

MOTION FOR APPROVAL OF COMPROMISE - PAGE 3
Matter: 6396-024

After setting up the asset protection scheme, and while watching Borup Construction, Inc.'s, business dwindle, the Borups began transferring the real properties into the land trusts, thus implementing the recommendations made by Frontline to shield their assets from their creditors.  Many of the assets transferred had significant equity value, and were real properties that were leased to various third-parties.  Consequently, the Borups' entities immediately began seeing income from those properties.  Some of that income was later invested in other pursuits, including the purchase of gold coins.

Sometime later, after Borup Construction, Inc.'s lenders had begun pursuing the guarantees (many of which obtained judgments against the Borups), and after one of their business partners sued them in Idaho state court for the alleged mismanagement of Borup Construction, Inc., the Borups filed separate Chapter 7 bankruptcy petitions.  Dean and Gail Borup's Chapter 7 case is presided over by Judge Jim D. Pappas with Jeremy Gugino as Chapter 7 Trustee (Case No. 10-02943-JDP); Keith and Judy Borup's Chapter 7 case is presided over by Judge Terry L. Myers  with Richard Crawforth as Chapter 7 Trustee (Case No. 10-02944-TLM).

Both of the Borups failed to disclose their ownership interest in several of the entities which made up the asset protection scheme in their original bankruptcy petitions or schedules.  It was only at or after the 341 Meetings of Creditors that the Trustees began to discover the extent of the Borups' asset protection scheme.  After initial settlement discussions with the Borups proved fruitless, the Trustees pursued separate adversary proceedings to recover the myriad assets that had been transferred by the Borups within the years prior to their bankruptcy petitions.  (The adversary proceedings were later consolidated for all purposes.)  As part of the adversary proceedings, the

MOTION FOR APPROVAL OF COMPROMISE - PAGE 4
Matter: 6396-024

Trustees were successful in seeking injunctions to freeze many of the Defendants bank accounts. Additionally, those same injunctions prohibited the further transfer of any of the assets of certain Defendants (including the transfer of the gold coins). Lastly, the Trustees received an injunction requiring the property management company (Cobblestone Property Management) to hold any rent payments that it received, pending the outcome of the adversary proceedings.

Having litigated the adversary proceedings for some time, the Trustees and Defendants have agreed to a compromise of most[1] of the claims in the adversary cases.

**PROPOSED COMPROMISE**

The specific terms of the compromise are outlined on the "Settlement and Release Agreement" attached hereto as *Exhibit C*.[2] In general terms, however, the compromise consists of the following:

A. <u>All</u> of the real properties currently owned by the Defendants will be immediately transferred to the Trustees, to be liquidated by the Trustees (including any properties that do not currently appear to have equity). The bankruptcy estates shall receive 85% of the net proceeds of the sale of the properties (with the remaining 15% going to the Defendants). For

---

[1] In the second adversary proceeding, Case No. 12-06018-TLM, Richard Crawforth is pursuing a fraudulent transfer claim related to Keith and Judy Borup's transfer of $200,000.00 to Principal Life Insurance Company to set up two annuity accounts. Neither of these annuities were "annuitized" at the time Keith and Judy Borup filed their bankruptcy petition. The compromise described herein does not affect those claims related to the annuities, and those claims will continue to proceed to trial.

[2] The "Settlement and Release Agreement" attached hereto is an unsigned copy. At the time of filing this Motion, the Trustees had both signed the Agreement. However, the complete signatures of all of the Defendants were still in the process of being obtained. The Trustees intend to supplement this motion prior to the hearing in order for a complete signed copy of the Agreement to be before the court and available to interested parties.

MOTION FOR APPROVAL OF COMPROMISE - PAGE 5
Matter: 6396-024

residential property that is not closed within 6 months of the approval of the compromise, the estates would receive 100% of the proceeds. For commercial property that is not under contract within 4 months of the approval of the compromise (or that is under contract, but does not ultimately close), the estates would receive 100% of the proceeds.

B.  Of the funds currently being held by Cobblestone Property Management, $20,000.00 shall be reserved for continued maintenance and insurance for the real properties pending their sale. The remainder of the funds currently being held (and any funds which are received after the compromise is approved before a sale is completed) shall be split, with 85% of the funds going to the bankruptcy estates, and 15% of the funds going to the Defendants. (For any of the properties which are not sold within the six-month period, the estates shall then receive 100% of the continued rent payments.)

C.  85% of the gold coins currently held by Dean Borup (or an entity associated with him – believed to be 17 coins) shall immediately be turned over to his bankruptcy trustee, Jeremy Gugino.

D.  Keith Borup (or an entity associated with him) previously sold the gold coins he possessed. Keith Borup (or an entity associated with him) shall immediately turn over 85% of the value he received (or $27,370.00) to his bankruptcy trustee, Richard Crawforth.

E.  85% of the balance held in any bank account by the Defendants shall immediately be paid to the bankruptcy estates.

MOTION FOR APPROVAL OF COMPROMISE - PAGE 6
Matter: 6396-024

F. All of the assets or funds paid or transferred to the bankruptcy estates shall be split by the separate bankruptcy estates consistent with, and/or pursuant to, the previously-approved compromise between the two estates.

G. The Defendants and the Debtors each waive their right to claim any exemption in the property being transferred, or proceeds therefrom.

H. The Defendants waive any right they may have to file a Proof of Claim in the bankruptcy cases arising out of the compromise.

I. Any tax consequences due to the previously-filed tax returns for the entities or Debtors are to be born solely by the Defendants and/or Debtors. In addition, it shall be the Defendants and/or Debtors responsibility to prepare, pay for, and file any 2011 tax returns, and to pay any penalties, fees or costs incurred by the failure to timely file 2011 tax returns for the various Defendants.

The remaining and specific terms of the compromise can be found on the attached *Exhibit C*.

## LEGAL AUTHORITY FOR COMPROMISE

Subject to Court approval, the Trustee asserts that the proposed settlement is a "fair and equitable" resolution of the matters, based upon factors such as: the probability of successfully litigating the claims; difficulty in enforcement of a judgment; the complexity, expense and delay of the litigation; the risk of non-collection; and the paramount interest of creditors, as analyzed below. *See In re: Marples*, 266 B.R. 202,

Case 10-02944-TLM   Doc 108   Filed 07/27/12   Entered 07/27/12 11:51:09   Desc Main
Document    Page 8 of 14

206, 01.3 I.B.C.R. 116, 118 (Bankr. D. Idaho, 2001); *Martin v. Kane (In re: A&C Properties)*, 784 F.2d 1377, 1381-83 (9th Cir., 1986).

## **PROBABILITY OF SUCCESSFULLY LITIGATING THE CLAIM**

The Trustees are pursuing three distinct claims against the Defendants in this matter: actual fraud, constructive fraud and alter ego claims.  In order to prove an actual fraud claim against the Defendants, the Trustees must prove that the Debtors transferred the property with the actual intent to hinder, delay or defraud creditors.  This can be proved either through evidence of the Debtors actual intent, or through using the so-called "badges of fraud."  In preparing for trial in this matter, the Trustees have fully investigated the claims against the Defendants.  Through that investigation, the Trustees have obtained written statements signed by the Debtors showing that their goals in setting up the asset protection scheme were to provide privacy for their assets and make it difficult for creditors to recover the assets.  Further, through the evidence developed in this case, the Trustees are confident they can show the following badges of fraud[3]:

- That the Debtors retained possession or control of the property transferred after the transfers;

- That the transfers were concealed or not disclosed;

- That the transfers were to insiders (either statutory, or non-statutory);

---

[3] The Trustees recognize, of course, that the court will not simply tally the number of badges of fraud shown by the Trustees and compare that number with those not proven. However, the Trustees are confident that the overwhelming majority of the badges of fraud can be shown in this case.

MOTION FOR APPROVAL OF COMPROMISE - PAGE 8
Matter: 6396-024

- That the value of the consideration received by the Debtors for the transfers was not reasonably equivalent to the value of the property transferred (in fact, that the Debtors likely received no value in return for the transfers);

- That before the transfers (or at least some of them) occurred, the Debtors had been sued or threatened with suit;

- That the transfers were of substantially all of the Debtors non-exempt assets;

- That the Debtors were insolvent or became insolvent shortly after the transfers occurred; and

- That the transfers occurred shortly before or shortly after a substantial debt was incurred by the Debtors.

Based on this evidence, the Trustees are highly confident they can prove an actual fraud claim at the trial in this matter. Nevertheless, there remains some risk of proceeding to trial. The Defendants have continually maintained that the Trustees actual fraud claims are weak (albeit without describing any specifics as to why they believe those claims are weak). Furthermore, the Borups have been consistent in their claims that the entity structures they created were for estate planning purposes and had nothing to do with protecting assets from their creditors. While the Trustees believe they have ample evidence to discredit these claims, it is likely the Borups, their wives and their children (the alleged beneficiaries of the scheme) would testify that the entity structures were created to help ensure the future financial security of the Borups' children.

In order to prove a constructive fraud claim, the Trustees must prove that the Debtors were insolvent at the time they made the transfers (or became insolvent as a result thereof), and did not receive reasonably equivalent value for the transfers. As

MOTION FOR APPROVAL OF COMPROMISE - PAGE 9
Matter: 6396-024

discussed above, the Trustees remain confident that the Debtors did not receive any value for the transfers. The Trustees have employed an expert accountant to testify as to the Debtors insolvency at the time of the transfers. The Trustees are reasonably confident that they can show that the Debtors either were insolvent at the time of the transfers, or became insolvent as a result of the transfers. Nevertheless, proceeding to trial always carries some risk, and the Defendants have adamantly defended that the Debtors were not insolvent at the time of the transfers.

Lastly, the Trustees have pursued an alter ego claim, asserting that the Defendants (or, at least, the entity defendants) were simply alter egos of the Debtors, and should be disregarded, with their assets considered to be assets of the Debtors. The Trustees possess significant evidence of intermingling of funds between the various entities, of the Debtors retaining complete control over the business and assets of those entities, and of the Debtors failure to comply with the required corporate formalities of those entities (i.e., not having company meetings or minutes, not getting consent from remaining members or partners as required, not complying with the governing documents of the company, etc.). The Trustees are confident that they can prevail on the alter ego claims, but there is always a chance they cannot sufficiently prove those claims at trial. The Defendants have asserted that they complied with all required formalities and the company documents, and that they were not simply the alter ego of the Debtors.

In sum, the Trustees believe they possess claims against the Defendants which they have a good chance of winning at trial. Nevertheless, the Trustees recognize the inherent risk in proceeding to trial, and the high burdens of proof at trial, especially when the Defendants vigorously dispute certain elements of the Trustees' claims.

## DIFFICULTY IN ENFORCEMENT OF A JUDGMENT

Any judgment which the Trustees would obtain against the Defendants would be to recover the properties initially transferred and the funds that are currently frozen. In the event the Trustees could prevail on their claims, they do not believe there would be significant difficulty in enforcing the orders avoiding the transfers or releasing the funds.

## COMPLEXITY, EXPENSE AND DELAY OF THE LITIGATION

The litigation being pursued by the Trustees is large and complex. There are over 56 Defendants being pursued in the two separate cases, and the detailed asset protection scheme created by the Defendants further complicates the proof required at trial. Additionally, there are approximately 20 different transfers at issue in the case, all of which the Trustees are attempting to recover. In other words, this is not a simple fraudulent transfer case, with discreet facts and a single transfer.

With regard to the expenses of going to trial, as the Defendants have disputed the solvency of the Debtors at the time of the transfers, the Trustees have hired an expert accountant to testify to insolvency of the Debtors. There are at least 4 different transfer dates, requiring evidence and testimony of insolvency on all 4 dates. The Trustees estimate that they could easily expend over $25,000.00 in expert accountant fees if the claims proceed to trial. In the event the Defendants dispute the authenticity of certain documents[4], the Trustees would be forced to pay witness fees for the authentication and admissibility of those documents. Lastly, the Trustees' special counsel are employed on

---

[4] There would likely be hundreds of documentary exhibits in this case. While the Defendants have shown some cooperation in admitting the authenticity of certain documents, they have also expressed an unwillingness to admit to the authenticity of others.

MOTION FOR APPROVAL OF COMPROMISE - PAGE 11
Matter: 6396-024

a contingency-fee basis, having been approved for employment pursuant to 11 U.S.C. §328.  However, the contingency fee is different if the case settles than if it proceeds to trial.  If the claims are settled, the attorney fees would be 25% of the amount recovered; if the case proceeds to trial, the attorney fees are 33.33%.  Depending on the net amount recovered by the Trustees, this difference could total over $100,000.00 in attorney fees, which could be retained by the estates if the compromise is approved.

Lastly, the Trustees are unaware whether the Defendants would pursue an appeal of the case if the Trustees prevailed.  While trial in the adversary proceedings is currently set for November 1 and 2, 2012, if the Defendants appealed an adverse judgment, that would further delay the completion of the case.  For Dean and Gail Borup's bankruptcy (Case No. 10-02943-JDP), these claims are the sole remaining claims in the case.  While Keith and Judy Borup's bankruptcy trustee (Case No. 10-02944-TLM) is still pursuing an additional claim against Principal Life, that claim may also be settled prior to trial.  Thus, by settling these matters, the bankruptcy estates would be able to move quickly to liquidate the assets and make payments to the Borups' creditors.

**PARAMOUNT INTEREST OF CREDITORS**

This factor also favors approval of the compromise.  Through the compromise, the estates will be receiving 85% of their potential full recovery at trial.  However, the difference in attorney fees itself (over 8% difference) means the estates would really be recovering nearly 92% of their potential recovery at trial.  The 8% different between what the estates could recover after a trial, and what they are receiving from the compromise is easily outweighed by the various risks of proceeding to trial.  For instance, if the Trustees

MOTION FOR APPROVAL OF COMPROMISE - PAGE 12
Matter: 6396-024

do not prevail on just one of the transfers they are pursuing (but prevail on every other transfer), they will recover less than what the estates are receiving through the compromise. The additional expenses of continuing to trial, the risk of proceeding to trial, and the benefits of immediately recovering the property and liquidating it far outweigh the risks of trial and small difference in potential recovery.

Accordingly, the Trustees believe that the above-outlined compromise is in the best interest of the various creditors in the Debtors' bankruptcy cases.

## CONCLUSION

For the above-stated reasons, the Trustees assert that the instant compromise with the bulk of the adversary Defendants is a fair and equitable resolution of the issues relating to those Defendants and is, in their business judgment, in the best interests of the creditors. Based on the foregoing, the Trustees respectfully request the Court enter an order granting the Motion and approving the compromise with the listed Defendants.

DATED this 27th day of July, 2012.

/s/
MATTHEW T. CHRISTENSEN
Special Counsel for the Trustees

MOTION FOR APPROVAL OF COMPROMISE - PAGE 13
Matter: 6396-024

# CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 27th day of July, 2012, I electronically filed the foregoing document with the Clerk of the Court using the CM/ECF system in two separate cases (Case Nos. 10-02943-JDP and 10-02944-TLM) which sent a Notice of Electronic Filing to the individual(s) so noted below.

*Electronic Notification*

| | |
|---|---|
| Patrick J. Geile | pgeile@foleyfreeman.com |
| Matthew K. Shriver | mshriver@foleyfreeman.com |
| Matthew T. Christensen | mtc@angstman.com |
| Michael C. McClure | mcm@angstman.com |
| D. Blair Clark | dbc@dbclarklaw.com |
| Richard E. Crawforth | trustee@richardcrawforth.com |
| Jeremy Gugino | gugino@cableone.net |

Others as reflected on the court's CM/ECF notice in each separate bankruptcy case.


DATED: July 27, 2012


                                                /s/
                                       Matthew T. Christensen

MOTION FOR APPROVAL OF COMPROMISE - PAGE 14
Matter: 6396-024